# Richmond

## PILCHER V. PILCHER.

### March 11, 1915.

1.  WILLS—*Signature by Initials—Validity—Finality.*—A holograph
    will to which the testator affixes the initials of his name at
    the end of the writing is sufficiently signed under the statute
    of this State, and the position of such initials furnishes suffi-
    cient evidence of finality and completion of intent.
2.  SIGNATURE—*What Constitutes.*—What constitutes a signature
    must largely depend upon the circumstances of each par-
    ticular case, though in all cases the intent is a vital factor.
    Whatever symbol is used, it must appear that it "is intended
    as a signature."
3.  WITNESSES—*Husband and Wife—Privileged Communications.*—
    Communications between husband and wife made in the pres-
    ence of third persons are in no just sense either confidential
    or privileged.
4.  WILLS—*Revocation—Subsequent Will Not Signed.*—The fact that
    a testator, after duly executing a will, subsequently prepared
    the draft of a more formal will giving all of his property
    to the same beneficiary mentioned in the first will, but never
    signed it, cannot have the effect of revoking the will which
    was duly executed.

Error to a judgment of the Chancery Court of the city
of Richmond on an application to admit a will to probate.
Judgment for the applicant. Defendant assigns error.

*Affirmed.*

I shall make use of the clear and accurate outline of the
occurrences in this case found in the brief of counsel for
the defendant in error as furnishing a sufficient presenta-
tion of the material facts. It is as follows:

"Edwin M. Pilcher died in the city of Richmond, Virginia, on the 16th day of January, 1913, at the home of his sister, Mrs. Worsham, at the age of forty-six years, after an illness of about six months, from an affection of the heart, known as andocarditis, leaving surviving him his widow, the appellee, and his father, the Rev. John M. Pilcher, his sole heir at law and next of kin. He had been a member of the bar of that city for about twenty years, and, for some years preceding his death, was a commissioner in chancery of the chancery court of the city of Richmond. He was regarded as an accurate and careful lawyer, and experienced in the drawing of legal papers.

"For seven years prior to his last illness he had been engaged to be married to the lady who is now his widow, who lived in Wheeling, W. Va., but their marriage had been postponed from time to time because her mother's health was bad, and she was the only daughter at home. Early in December, 1912, when Mr. Pilcher's condition had become very serious, his fiancee came to Richmond and they decided to be married at once so that she might remain with him and help nurse him. They were accordingly married in his sick chamber on December 10, 1912, at the home of his sister, Mrs. Worsham.

"On December 15, 1912, Mrs. Pilcher's sister, Mrs. Belle K. Woods, came to Richmond and stayed with Mrs. Pilcher for about a week. On December 17th or 18th, while Mrs. Woods was alone with Mr. Pilcher in his sick chamber, he told her that he wished to make his will, and requested her to get him a piece of paper for that purpose. She was making some objection to his undertaking to write his will then, when Mrs. Pilcher entered the room, took her seat beside his bed, and proceeded to finish in pencil a letter to her mother, which she had already partly written in ink. Mr. Pilcher then said to his wife, 'I am going to make my will,' and asked her for a piece of paper. She, too, tried

to dissuade him, but he reached over and took from Mrs. Pilcher her pencil, her uncompleted letter, and the book, or magazine, upon which she was writing, and, resting the book, or magazine, against his knee wrote with the pencil, upon the back of the sheet on which Mrs. Pilcher had already written part of her letter in ink, the following words:

"'*I give to my wife, Alice McCabe Pilcher, all of my property, real and personal.*   E. M. P.'

"He then tore off that part of the paper on which these words were written and, holding it up, said, 'Girls, this is my will.   I have left Allie everything I have.'   Mrs. Woods commented on the brevity of the document, and he replied 'the shorter, the better.'   Mrs. Woods then commented on the use of his initials, and he replied, 'Why, that is as good a will as any man can make; that will will hold in any court—almost a mark will go, Belle.'   He then said to Mrs. Woods, 'I want you to preserve this.   That is my will.   I have left everything to Alice, I want you to see that she takes care of it.'   Mrs. Pilcher then placed the paper in a book or magazine in which she was pressing some violets, and Mrs. Woods did not see it again until it was found in Mr. Pilcher's bag in February, 1914, although Mr. Pilcher within the next day or two asked her where the paper was.

"On Christmas day, 1912, a friend came to see Mr. Pilcher while he was taking his bath, and in hurriedly removing the basin, Mrs. Pilcher knocked off the table the magazine containing this paper and the paper fell into the water. Mr. Pilcher made an effort to rescue it, but Mrs. Pilcher picked it up and, in the effort to dry it, the writing was blurred.   Mrs. Pilcher does not remember what became of the paper after that, although she does remember looking for it.   She says that she did not see it again until it was found fourteen months afterwards under the circumstances to be hereinafter narrated.

"After this paper fell into the water, although it does not appear exactly when, at the request of Mr. Pilcher, Mrs. Pilcher brought to his bedside a package of his private papers, which he had expressed the wish to have preserved, and left them with him, and it was in that package that the will was subsequently found.

"On December 26, 1912, Mr. Pilcher wrote in pencil a formal holograph will, leaving all of his property to his wife and appointing her as executrix thereof, but affixed to this paper neither his name nor initials. On cross-examination, Mrs. Pilcher stated that she knew why he wrote this paper, and that she did not think that he considered it as a will, but upon objection of counsel for contestant, she was not permitted to testify as to why it was written. This paper of December 26th was laid aside by Mrs. Pilcher and was found after Mr. Pilcher's death in the drawer of the dresser in her room.

"Mr. Pilcher died on January 16, 1913, and Judge Daniel Grinnan, who was then a practicing attorney and had, for many years, been a warm personal friend of Mr. Pilcher, took charge of, and undertook for Mrs. Pilcher the management of his affairs and estate, as she, because of her mental distress and agitation, was in no condition to do so. The paper dated December 26, 1912, above referred to, was found in Mrs. Pilcher's dresser and turned over to Judge Grinnan. The fact that this paper was not signed escaped the attention of all of the family, and even of Judge Grinnan, who, on January 23, 1913, accompanied Mrs. Pilcher and Mrs. Woods to the chancery court of the city of Richmond for the purpose of having said paper admitted to probate as Mr. Pilcher's will. Upon reaching the court the paper was shown to the presiding judge, who called Judge Grinnan's attention to the absence of any signature. Thereupon Judge Grinnan abandoned the idea of offering the paper for probate and, instead, immediately

moved on behalf of Mrs. Pilcher for her qualification as administratrix, and she at once qualified as such, although on account of a mistake in her name in the bond, it was necessary for her to sign another bond on January 24th. In qualifying as administratrix, the clerk administered to her the formal oath to the effect that as far as she knew or believed Mr. Pilcher left no will. A few days later Mrs. Pilcher returned with her sister to her old home in Wheeling, W. Va.

"Several weeks thereafter, in the latter part of February, 1913, Mrs. Pilcher was reminded by her sister, Mrs. Woods, of the will executed by Mr. Pilcher on December 17 or 18, 1912, and she at once wrote to Judge Grinnan telling him that such a paper had been drawn by Mr. Pilcher, and Judge Grinnan replied urging her to make a search for it, and to let him know if she found it.

"At that time her mother was very ill, requiring the constant attention of Mrs. Pilcher, her sister, and two trained nurses, and this condition remained unaltered until her mother died in October, 1913. In accordance, however, with Judge Grinnan's advice, Mrs. Pilcher and her sister then made such search for the will as their mother's condition permitted, but without success.

"After her mother's death in October, 1913, it was determined to break up the family home in Wheeling, and in February, 1914, while preparing to move, Mrs. Pilcher and Mrs. Woods came across a satchel of Mr. Pilcher's, which Mrs. Pilcher had carried from Richmond after his death, and in which they found a bundle of his private papers which he valued very highly—the same bundle which Mrs. Pilcher had handed to him at his request some time after Christmas day, 1912. In sorting over this bundle of papers they found an envelope upon which was written in the handwriting of Mr. Pilcher, but unsigned, this endorsement, 'my will, keep.' The envelope contained the paper

which had been written by Mr. Pilcher on December 17 or 18, 1912, together with memoranda of certain personal directions to Mrs. Pilcher. At that time Mrs. Pilcher had no reason to think that there would be any contest over the validity of the paper as Mr. Pilcher's will, she attached no special value to the envelope, and, therefore, did not preserve it.

"Mrs. Pilcher at once showed the will to her father's attorney in Wheeling, who advised her to take it in person to Richmond. She was then quite sick and unable to leave home, but as soon as her physician would allow her to travel, which was in the early spring, she brought the will to Richmond, where it was offered for probate on April 10, 1914.

"After notice to the Rev. John M. Pilcher, the father, sole heir and next of kin of E. M. Pilcher, deceased, as provided by law, and upon an issue of *devisavit vel non*—both parties waiving a jury—the court heard the evidence and admitted the said paper to probate as the will of E. M. Pilcher by order entered on the 9th day of June, 1914, from which order this appeal has been taken."

*Geo. Bryan,* for the plaintiff in error.

*John B. Minor,* for the defendant in error.

WHITTLE, J. (after making the foregoing statement), delivered the opinion of the court.

Stripped of immaterialities, the dominant question presented by this record for our decision is the validity of a holograph will, at the end of which the writer, to authenticate the paper, has attached his initials by way of signature, instead of his full name. At the outset it is conceded that the precise question is of first impression in

46

this jurisdiction, though affirmative precedent for the proposition is not lacking elsewhere. The circumstance is stressed by counsel for plaintiff in error that in *McBride* v. *McBride,* 26 Gratt. (67 Va.) 476, Judge Staples, who delivered the opinion of the court, expressed doubt whether signing a holograph will with the initials of the testator's name constituted a sufficient signing. In that case, McBride had caused the draft of a will to be prepared by his attorney, with the terms of which he had expressed his approval, but postponed its execution until he could secure two particular persons to act as subscribing witnesses. A few days later he wrote a letter to his brother in Texas, informing him of his domestic troubles, and assigning reasons for wishing to disinherit a certain child. After directing his brother to burn the letter, he concluded as follows: "I don't know where to direct this letter, and don't like much to send it on uncertainties, and will not sign it. You know who it is from if you get ———," and signed the letter, "J.," an initial of his Christian name. Two months after reading the draft of the proposed will, McBride was accidentally killed, not having executed the paper. The court held that the letter was not a testamentary paper, either alone or as connected with the draft of the will.

It is obvious that no other conclusion could have been reached on those facts. The proposed will was never signed; and the fact that McBride did not intend the initial "J." as a signing of the letter conclusively appears on its face. He directed his brother to burn the letter, and expressly declared that he would not sign it, and did not wish to be identified with the paper in any way. The learned judge, in discussing the question of signing by "initials," at page 487, observes: "In determining whether this letter constitutes a valid testamentary act, there is one other view which ought not to be omitted. It has been held in England

that a will is valid if signed with the initials of the testa-
tor's name, or even his mark, without any signature.    It
must be borne in mind, however, that under the English
statute every will, even though written wholly by the testa-
tor, must be attested by witnesses.    When, therefore, in
England, an initial is used only, the attestation of the wit-
nesses very clearly indicates that the testator designed
that this form of signature should be a signing.    Under our
statute, an autograph will is valid without witnesses.
Whether we can recognize an initial as sufficient, to the
same extent as the English courts, may not be so clear.
Upon that question we express no opinion.    Its decision is
not necessary for any of the purposes of this case."

The *dictum* of a lawyer of Judge Staples' acknowledged
ability and learning is entitled to, and certainly would re-
ceive from this court, most respectful consideration.    But,
Judge Staples not only expressed no opinion on the ques-
tion, but explicitly declined to do so on the ground that
it was not necessary for any of the purposes of that case.
He does, however, refer to the fact that it is held in Eng-
land "that a will is valid if signed with the initials of a
testator's name, or even his mark without any signature."
He also calls attention to the fact that the English statute
requires attesting witnesses to holograph wills as well as
others, and makes the suggestion that it may be the attesta-
tion of the subscribing witnesses that gives assurance that
the use of initials was designed as a signature.    But the
English cases holding the initials of the testator to be a suffi-
cient signature are not confined to instances where the
names of attesting witnesses are written in full.    The cases
go further and hold that the signature of the testator by
initials is sufficient, when the attesting witnesses also sign
by initials.

Thus, in *Goods of Blewett* (1880), 5 Law Rep. Prob. Div.,
p. 116, the court said: "The only question then is, whether

the signature and subscription by initials only are suffi-
cient.    A mark is sufficient, though the testator can write
(*Baker* v. *Dening*, 8 Ad. & E. 94).    Initials, if intended to
represent the name, must be equally good.    The language
of the Lord Chancellor in *Hindermarsh* v. *Charlton*, 8 H. L.
C. 160, at p. 167, seems equally applicable to the testator's
signature as to the witnesses' subscription: 'I will lay
down this as my notion of the law, that to make a valid
subscription of a witness there must either be the name or
some mark which is intended to represent the name'; and
Lord Chelmsford says: 'The subscription must mean such
a signature as is descriptive of the witness, whether by
mark or by initials, or by writing the name in full.' "

So, in *Margary and Layard* v. *Robinson* (1886), 12 Law
Reports, Prob. Div., p. 8, where the signature of the testator
was by mark and that of the attesting witnesses by initials,
it was held that the signature of the testator and the sub-
scription of the witnesses were sufficient.

Having noticed what is required by the English statute
of wills and the construction placed upon it by the courts
of that country, let us turn now to our own statute, the cor-
rect interpretation of which, at last, must control the case
in judgment.

Va. Code, 1904, sec. 2514, reads as follows: "No will
shall be valid unless it be in writing and signed by the
testator, or by some other person in his presence and by
his direction, in such manner as to make it manifest that
the name is intended as a signature; and moreover unless
it be wholly written by the testator, the signature shall be
made or the will acknowledged by him in the presence of
at least two competent witnesses, present at the same time;
and such witnesses shall subscribe the will in the presence
of the testator, but no form of attestation shall be neces-
sary."

It will be observed that the statute makes no distinction in the character of the signature, or what constitutes a sufficient signature, between holograph and attested wills. It gives precisely the same force and effect to the former that it accords to the latter. By force of the statute one is made the equivalent of the other, though the manner of proving the two kinds of instruments is different; nevertheless, each possesses the same authenticity.

Now, all the authorities, English and American (including the *quaere* in *McBride* v. *McBride*) agree, *that if this will had been attested, it would have been well signed under the English statute. Therefore, being holograph, it must follow that it is well signed under the Virginia statute, since that statute does not require attestation in such case.*

Nor does the Virginia statute define what shall constitute a "signature," but only prescribes that the will shall be signed "in such manner as to make it manifest that the name is intended as a signature."

Webster's New International Dictionary defines "signature" to be "A sign, stamp, or mark impressed, as by a seal * * *" Also, "The name of any person, written in his own hand, to signify that the writing which precedes accords with his own wishes or intentions; a sign manual; an autograph."

The Standard Dictionary defines it to be, "The name of a person, or something representing his name, written, stamped, or inscribed by himself, or by deputy * * *"

No dictionary, so far as we are advised, restricts the meaning of "signature" to a written name; therefore, according to these definitions, what constitutes a signature must largely depend upon the circumstances of each particular case, though in all cases the intent is a vital factor. Whatever symbol is employed, it must appear that it "is intended as a signature."

Although, as remarked, there is no decision of this court
directly in point, authority in this country is abundant for
the proposition that the use of his initials by a testator
*animo signandi* is a sufficient signing of his name.

The discussion of the subject in *Knox's Appeal* (1889),
131 Pa. 220, 18 Atl. 1021; 17 Am. St. Rep. 798, 6 L. R. A.
353, is instructive. In that case a letter testamentary in
character, in the handwriting of the deceased and signed by
her with her Christian name only, was held to be a valid will.
And the court was of opinion that a will signed by the testa-
tor with his initials made a stronger case for upholding the
instrument. It quotes with approval from Browne on the
Statute of Frauds, sec. 362, as follows: "In cases where the
initials only of the party are signed, it is quite clear
that, with the aid of parol evidence which is admitted to
apply to them, the signature is to be held valid."

In 1 Jarman on Wills (6th Am. Ed.), 106-108, it is said:
"It has been decided that a mark is sufficient, notwithstand-
ing the testator is able to write, and though his name does
not appear on the face of the will. A mark being sufficient,
of course the initials of the testator's name would also suf-
fice."

The leading text-writers speak with one voice on the sub-
ject. Jarman on Wills, *supra;* Page on Wills, sec, 172;
Schouler on Wills (3rd ed.), sec. 303; 1 Redfield on the Law
of Wills (3rd ed.), pp. 203, 205; Rood on Wills, secs. 254,
255.

That testator's signature by a mark is sufficient is well
settled by the Virginia authorities. *Smith* v. *Jones*, 6 Ran.
(27 Va.) 36; *Clarke* v. *Dunnavant*, 10 Leigh (37 Va.) 14;
*Rosser* v. *Franklin*, 6 Gratt. (47 Va.) 1, 52 Am. Dec. 97; 3
Lomax's Dig.. (2nd ed.), pp. 38, 70; 2 Minor on Real Prop-
erty, sec. 1252; Long's Notes on the Law of Wills (1910),
p. 17.

Adverting for a moment to the facts: We have before us a paper which, though exceedingly brief, is distinctly testamentary in character and terms, and by which the disposition of the property, in the circumstances, was a natural one. Testator was a lawyer in full possession of his mental faculties, and there is no question that the paper was wholly written by him, and signed with his initials at the appropriate place for his signature—the end of the instrument. Immediately before the paper was written, testator said to his wife and her sister, Mrs. Woods, "I am going to make my will," and after it was written, holding the paper up, he said: "Girls, this is my will. I have left Allie everything I have." In response to Mrs. Woods' comment on the brevity of the document, he remarked, "The shorter, the better." When she called attention to the use of his initials, he replied, "Why, that is as good a will as any man can make; that will hold in any court—almost a mark will go, Belle." He then said to Mrs. Woods, "I want you to preserve this. That is my will: I have left everything to Alice. I want you to see that she takes care of it." This evidence, and it is uncontradicted, plainly establishes testamentary intent and that the initials were used *animo signandi.*

The decisions of this court hold that the position of the signature at the end of the will furnishes sufficient internal evidence of finality or completion of intent. *Ramsey* v. *Ramsey*, 13 Gratt. (54 Va.) 664, 70 Am. Dec. 438; *Roy* v. *Roy*, 16 Gratt. (51 Va.) 418, 419, 84 Am. Dec. 696; *McBride* v. *McBride*, 26 Gratt. (67 Va.) 476, 487; *Dinning* v. *Dinning*, 102 Va. 467, 469-470, 46 S. E. 473.

We entertain no doubt, either from the standpoint of reason or authority, that the writing in controversy was executed in substantial compliance with the statute, and, as the chancery court held, is the true last will and testament of Edwin Pilcher, deceased.

There are two other subordinate assignments of error which may be briefly noticed.

(1) The first involves the ruling of the trial court on the admissibility of certain testimony of Mrs. Pilcher, under section 3346-a, cl. (3) of the Code. The observations on that point by his honor, Judge Beverley T. Crump, who presided at the trial below, show a correct conception of the restrictive features of the statute. He sedulously safeguarded the admission of such communications between husband and wife as the statute was intended to protect, and confined the examination of the wife strictly to matters with respect to which she was clearly a competent witness. The communications to the admission of which exception was taken were made in the presence of a third person, and in no just sense were either confidential or privileged.

(2) We attach no significance to the circumstance that some ten days after the first will was executed Mr. Pilcher prepared the draft of a more formal will. Admittedly he did not sign it, and the paper indicates no change of purpose on his part, since by the last paper, as by the first, he leaves all his property to his wife. Besides, Mrs. Pilcher, in response to the question on cross-examination, " * * * can you tell the court what induced Mr. Pilcher to write the paper of December 26th, if he considered the first paper his will?" answered: "I do not think he considered this last paper he wrote as a will. He told me—" Mr. Bryan (the propounder of the question) : "I object." Witness: "I do know what induced him to do it." But, at that point, an objection was again interposed and sustained by the court.

It thus appears that the information was at hand, but was excluded on technical grounds. Whatever may have been the intention of the testator, however, in writing the

second paper, it was never signed by him and could not have had the effect of revoking his will.

Upon the whole case, we are of opinion that the sentence of the chancery court is plainly right and must be affirmed.

*Affirmed.*