## CIRCUIT COURT OF THE CITY OF RICHMOND

Beverly S. Pierce

v.

Foreign Mission Board of the
Southern Baptist Convention

May 18, 1992

Case No. LT-2018-4

BY JUDGE RANDALL G. JOHNSON

This case raises several questions about the existence or nonexistence of employment contracts between Beverly S. Pierce and the Foreign Mission Board of the Southern Baptist Convention. Plaintiff, a former employee of defendant, has filed a four-count second amended motion for judgment. The first three counts allege breach of contract, such counts alleging that certain employment contracts were breached by defendant when plaintiff was terminated. Specifically, Count I alleges that certain written policies promulgated by defendant, as well as a memorandum delivered to plaintiff shortly before her termination, constitute contracts of employment which provided that plaintiff would be terminated only for cause and that defendant breached those contracts when plaintiff was terminated without cause.

Count II repeats plaintiff's allegations concerning the previously referred-to memorandum and alleges a breach of contract when defendant terminated plaintiff in spite of plaintiff's having fulfilled the requirements imposed upon her by that memorandum. Count III alleges that defendant's written grievance procedure constitutes a con-

tract which defendant breached when it terminated plaintiff in retaliation for having "expressed" a grievance concerning her job responsibilities, job description, and supervision. And Count IV alleges a violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d).

Defendant has demurred to the first three counts of the second amended motion for judgment. Count IV is not presently challenged.

### 1. *Policy Numbers 1000–030 and 1000–032*

From time to time, defendant issues policy statements dealing with various aspects of defendant's activities, including employment. Two of those statements, Numbers 1000–030 and 1000–032, are alleged by plaintiff to constitute binding employment contracts providing that employees can be terminated only for cause. Defendant's demurrer is based on the statute of frauds, Va. Code § 11–2, defendant contending that neither statement bears the signature of anyone authorized to enter into a contract for defendant. In support of its position, defendant cites the case of *Falls v. Virginia State Bar*, 240 Va. 416, 397 S.E.2d 671 (1990).[1]

The statute of frauds provides, in pertinent part:

> Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought in any of the following cases . . . .
>
> 8. Upon any agreement that is not to be performed within a year . . . .

Va. Code § 11–2.

In *Falls*, the Supreme Court held that the presence of the Virginia State Bar's logo on its personnel manual was not a "signature" within the meaning of the statute's requirement that the writing be "signed by the party to be charged," and that, accordingly, the statute of frauds precluded an action by a former State Bar employee for breach of contract based upon the personnel manual. It is defendant's

---

[1] The court expresses no opinion on whether either or both of the subject policy statements contain provisions which prohibit defendant from terminating employees except for cause. Such issue is not raised in defendant's demurrer, and Va. Code § 8.01–273 provides that "[n]o grounds other than those stated specifically in the demurrer shall be considered by the court."

position that *Falls* requires the same ruling here with regard to Policy Statements 1000–030 and 1000–032. I believe defendant gives *Falls* too broad a reading.

Policy Statement 1000–030 states as its subject "Home Office Employment Guidelines." As issued on June 15, 1981, the statement consists of three typewritten pages. At the bottom right corner of the first page, in the space where documents are usually signed, the following is typed:

Homer E. Beaver
Administrative Assistant to the President

On December 8, 1981, a new Policy Statement 1000–030 was issued. The new statement, which states on its face that it replaces the statement issued June 16, 1981, consists of two pages. On the first page, in the same place as on the previous statement, is typed:

Homer E. Beaver
Administrative Assistant to the President

With regard to Policy Statement 1000–032, five different statements are involved, each of the last four statements purportedly replacing the preceding one. They are dated June 15, 1981, February 1, 1982, January 17, 1984, February 17, 1984, and March 1, 1988. On each of the first four statements, each of which is two pages long, and again at the bottom right corner of the first page, is the typewritten name and title of Homer E. Beaver exactly as it appears on the latter version of Policy Statement 1000–030. The March 1, 1988, Policy Statement 1000–032 which, as already noted, purportedly replaces the previous version, does not contain Mr. Beaver's name and title, nor the name of any other person, anywhere on the statement. It is plaintiff's position that Mr. Beaver's typewritten name on the policy statement, together with the allegation in the motion for judgment that Beaver's name was placed on the policy statements by defendant with the intention that it be a signature, is sufficient to survive demurrer. I agree.[2]

---

[2] Neither side addressed in brief or oral argument the significance, if any, of the fact that the March 1, 1988, statement, unlike the earlier ones, does not contain the typewritten name of Mr. Beaver. The court expresses no opinion on any possible

It is universally held that any mark, symbol, sign, or other "thing" can be a signature if the person making the mark or other thing intends that it be so. This is specifically true where the statute of frauds is concerned. For example, The Restatement (Second) of Contracts § 134 (1979) states:

> The signature to a memorandum may be any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer.

Restatement (Second) at 348.

Comment a to the above states:

> *a. Types of symbol.* The traditional form of signature is, of course, the name of the signer, handwritten in ink. But initials, thumbprint or an arbitrary code sign may also be used; and the signature may be written in pencil, *typed*, printed, made with a rubber stamp or impressed into the paper. Signed copies may be made with carbon paper or by photographic process.

*Id.* (emphasis added).

Similarly, in 72 Am. Jur. 2d *Statute of Frauds* § 358 (1974), it is said:

> There is no requirement that the signature to a memorandum required by the statute of frauds be in any particular form, and to satisfy the statute of frauds, the memorandum required need not be signed in ink. It may be signed by lead pencil. Also, and except where the statute requiring the memorandum to be "subscribed" has been construed as meaning an "actual manual subscription," it is the well established general rule that it is not essential to satisfy the statute of frauds that the memorandum required thereby be signed by the hand of the party to be charged. The general rule is that the signature may be affixed by a stamp, *or it may be typewritten* or printed mechanically, if, but only if, by signing in any of these methods the party whose signature is essential intends to authenticate the instrument as his act.

*Id.* at 883 (emphasis added, citations omitted).

---

significance here.

And in 37 C.J.S. *Statute of Frauds* § 204 (1943), the authors state:

> Where employed with intent to authenticate the writing, a printed, stamped, or *typewritten signature* will satisfy the requirements of the statute of frauds.

*Id.* at 697 (emphasis added).

In fact, the principle that *any* mark, when coupled with an intent by the maker that it be a signature, will satisfy the statute of frauds is so well settled that citations to the legions of cases so holding are unnecessary. The curious reader will, of course, find many such cases in the notes to the three treatises cited above. It is important to note, however, that the principle stated in the treatises is fully consistent with Virginia cases. Thus, while there appear to be no Virginia cases which deal specifically with *typewritten* signatures, there are cases dealing with other marks. For example, in *Pilcher v. Pilcher*, 117 Va. 356, 84 S.E. 667 (1915), the Court considered whether a testator's initials were a sufficient signature to a will. It was held that they were:

> [I]n *Goods of Blewett* (1880), 5 Law Rep. Prob. Div., p. 116, the court said: "The only question, then, is whether the signature and subscription by initials only are sufficient. *A mark is sufficient, though the testator can write (Baker v. Dening*, 8 Ad. & E. 94). Initials, if intended to represent the name, must be equally good. The language of the Lord Chancellor in *Hindermarsh v. Charlton* 8 H.L.C. 160, at p. 167, seems equally applicable to the testator's signature as to the witnesses' subscription: 'I will lay down this as my notion of the law that to make a valid subscription of a witness there must either be the name *or some mark* which is intended to represent the name;' and Lord Chelmsford says: 'The subscription must mean such a signature as is descriptive of the witness, *whether by mark* or by initials, or by writing the name in full'."

117 Va. at 363–64 (emphasis added).

Then, after discussing dictionary definitions of the word "signature," the court concluded:

> No dictionary, so far as we are advised, restricts the meaning of "signature" to a written name; therefore, according to these definitions, what constitutes a signature must largely

depend upon the circumstances of each particular case, though in all cases, the intent is a vital factor. *Whatever symbol is employed*, it must appear that it "is intended as a signature."

*Id.* at 365.

Similarly, in *Ferguson v. Ferguson*, 187 Va. 581, 47 S.E.2d 346 (1948), the Court stated:

The meaning of "signature" is not restricted to a written name. Where the testator puts his mark to the subscription of his name to his will, in the presence of two or more subscribing witnesses, this is a sufficient signing within the meaning of our statute.

187 Va. at 590.

It is my opinion that the above cases clearly indicate Virginia's adherence to the almost universally held principle that *any* mark, of whatever character or description, is a signature when so intended by the maker, and I now so hold.

Defendant argues that the holding which I now make is precluded by *Falls*. Specifically, defendant points to the following language in *Falls* as requiring a *handwritten* signature:

Falls further contends that his employment contract complies with the statute of frauds because the Bar's personnel manual was a part of the contract and bore the Bar's logo. According to Falls, the use of the logo satisfied the statute's requirement of a signature "by the party to be charged." Assuming, but not deciding, that the manual stated the essential terms of the job-security agreement that Falls alleges, Falls cites, and we find, no cases which support his contention that use of a logo under these circumstances meets the statutory requirement that the document be "signed by the party to be charged." In dealing with the requirement of a signature to comply with the statute of frauds, we said that "a signing consists of both the act of *writing a person's name* and the intention, in doing this, to execute and authenticate the instrument signed." *Sutherland v. Munsey*, 119 Va. 791, 796, 89 S.E. 882, 883 (1916).

*Troyer v. Troyer*, 231 Va. 90, 94–95, 341 S.E.2d 182, 185–86 (1986), relied upon by Falls, is inapposite. There, a liti-

gant, testifying by deposition, described the contract in his testimony and expressly authorized the notary to sign his name to the deposition. Under those circumstances, we held that the deposition constituted a memorandum sufficient to satisfy the requirements of the statute of frauds. In this case, however, no representative of the Bar *signed* the document, and there was nothing to show that the Bar had the logo printed on the manual with the intent to adopt the logo as its signature. Therefore, we conclude that the logo did not constitute a signature by the Bar.

240 Va. at 416–17 (emphasis added).

I do not read the above language as literally as does defendant. If I did, I could not explain *Pilcher* and *Ferguson*, both *supra*, in which initials and marks were accepted and names were not "written." Nor could I explain the use of signature stamps and photocopied signatures, both of which are accepted as valid and binding signatures in all areas of life. In my opinion, *Falls* must be limited to the particular facts of that case; that is, that where there is "nothing to show" that a party affixed a name, mark, or other symbol with the intent that such name, mark, or symbol be a signature, as was apparently the case in *Falls*, the statute of frauds bars suit. Here, there *is* something to show, at least on demurrer, that Homer E. Beaver's name was typed on defendant's policy statements as a signature. First, it was typed in a location on the paper which, in our society, is normally reserved for signatures. Second, it is typed with his official title. Third, it is on the first page of each of the policies involved, with the exception of the March 1, 1998, version of Policy Statement 1000–032. And fourth, there appears to be no reason at all for Mr. Beaver's name and title to be on the policy statements *other than* as a signature. For all of these reasons, at least on demurrer, the statute of frauds is not a bar. Only if Virginia departs from nearly every other jurisdiction which has addressed the subject and holds that in all cases, regardless of intent, a signature must be a name written by some human being *by hand* will the statute require sustaining defendant's demurrer. I do not believe the Supreme Court has so held, and defendant's demurrer to Count I, or at least the portion of Count

I which deals with Policy Statements 1000–030 and 1000–032, is overruled.[3]

## 2. *The January 15, 1991, Memorandum*

On January 15, 1991, plaintiff was given a memorandum signed by three officers or agents of defendant. The memorandum listed problems which had purportedly developed in plaintiff's job performance and set out certain improvements which plaintiff would have to make "if you choose to remain in the employ of the Foreign Mission Board." The memo then concluded:

> Progress in these areas will be monitored on a weekly basis, and a full review will be done at the end of ninety (90) days from this date. If immediate and significant ongoing improvement is not demonstrated in all three areas, it will be necessary to terminate your employment.

Plaintiff argues that the above language is a contract providing for cause termination only. I disagree.

First, the language itself states only that plaintiff will be terminated if she does *not* show progress in the subject areas. It does not state that she will be forever employed if she *does* show progress. Moreover, as defendant correctly observes, plaintiff's position would lead to the anomalous situation that a person who has always performed his or her job in a satisfactory or even exemplary manner, thus generating no "threatening" memoranda, would have less job security than an employee whose performance has been so poor as to generate such a memorandum. Thus, a person with a horrendous absentee record who is told that two more absences will result in termination would have more protection than an employee who has never been absent since, under plaintiff's argument, the latter employee can be fired for his or her first absence, but the first employee can only be fired for the second absence. Such a result is untenable, and plaintiff's argument is rejected. As already noted, however, it is not simply the result which mandates the court's decision. The language

---

[3] Plaintiff argues that the statute of frauds does not come into play for the additional reason that the contract could have been performed with a year; that is, that since it was possible that plaintiff could have given defendant cause to fire her within the first year of her employment, the statute does not apply. The same argument, however, was also made by the plaintiff in *Falls* and was roundly rejected by the Supreme Court. This court is bound by that decision.

of the January 15, 1991, memorandum simply does not create the contract urged by plaintiff. The demurrer to Count II of the second amended motion for judgment, as well as to that portion of Count I which relies on the subject memorandum, is sustained.

3. *Policy Number 1000–065*

Finally, defendant demurs to Count III of the motion for judgment. Count III alleges that defendant breached plaintiff's contract embodied in defendant's Policy Number 1000–065, entitled "Employee/Management Communication Process." Specifically, plaintiff states that defendant violated the following provision of that policy:

> An employee will not be penalized in any way for discussing or presenting a problem via any of the three channels named in the above paragraph.

In addition, plaintiff argues that terminating an employee for having filed a grievance is a violation of public policy, thus creating an independent cause of action under the holdings of *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985), and *Miller v. SEVAMP, Inc.*, 234 Va. 462, 362 S.E.2d 915 (1987). Both contentions are rejected.

First, Policy Number 1000–065 is not signed. It contains no name, written or typed, of any officer, agent, or employee of defendant. While it does have "Foreign Mission Board of the Southern Baptist Convention" printed at the top, that is not, in my opinion, sufficient to satisfy the statute of frauds. There is a significant difference between a form document with an entity's name printed on it, and the same document with a typed name of an officer or agent where signatures usually appear. Thus, while the other policy statements contain sufficient indicia of a signature to survive demurrer, Policy Number 1000–065 does not.

With regard to plaintiff's public policy argument, that argument also fails. While this court has recently recognized the existence of a public policy exception to Virginia's employment-at-will doctrine (*see Seay v. Grace Jefferson Home*, 26 Va. Cir. 355 (1992)), such exception must be based on a specific, recognized, and established public policy:

> *Bowman* applied a "narrow exception to the employment-at-will rule," . . . but it fell far short of recognizing a gener-

alized cause of action for the tort of "retaliatory discharge." Declining to follow sweeping adoption of such a cause of action in other jurisdictions, *Bowman* recognized an exception to the employment-at-will doctrine limited to discharges which violate *public* policy, that is, *the policy underlying existing laws designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general.* Each of the illustrative cases from other jurisdictions cited in *Bowman* involved violations of public policies of that character. 229 Va. at 539–40, 331 S.E.2d at 801. The exception we recognized was not so broad as to make actionable those discharges of at-will employees which violate only private rights or interests.

234 Va. at 467–68 (second emphasis added).

Here, even if plaintiff was terminated in retaliation for having lodged a grievance, such termination affects her only. It does not affect the property rights, personal freedoms, health, safety, or welfare of anyone else. Accordingly, the law does not provide a remedy for it.

## Conclusion

For the reasons stated above, defendant's demurrer to Counts II and III of plaintiff's second amended motion for judgment, as well as so much of Count I as seeks to state a cause of action for breach of any alleged contract embodied in the January 15, 1991, memorandum, is sustained. In all other respects, the demurrer is overruled.